**Rabbi Avi WEISS, Plaintiff,**

v.

**Cardinal Jozef GLEMP, Defendant.**

No. 91 Civ. 6879 (RPP).

United States District Court,
S.D. New York.

March 18, 1992.

**216**

Alan M. Dershowitz by Alan M. Dershowitz, Rosanna Cavallaro, Cambridge, Mass., for plaintiff.

Williams & Connolly by Kevin T. Baine, Kevin J. Hasson, Washington, D.C., Debevoise & Plimpton by John G. Keoltl, New York City, for defendant.

## OPINION AND ORDER

ROBERT P. PATTERSON, Jr., District Judge.

This is an action for damages brought by Rabbi Avi Weiss ("Rabbi Weiss") against Cardinal Jozef Glemp ("Cardinal Glemp") alleging slander and defamation. Cardinal Glemp moves to dismiss the Complaint pursuant to Rules 12(b)(2), 12(b)(5), and 12(b)(6) of the Federal Rules of Civil Procedure on the grounds that: (1) the Court lacks personal jurisdiction over the Defendant because service of process was insufficient; (2) Plaintiff is barred, under principles of res judicata and collateral estoppel, by a judgment on an identical claim entered in the Defendant's favor by the courts of Poland; and (3) under the doctrine of *forum non conveniens*, this Court is not an appropriate forum for resolution of this dispute.

The motion was returnable on November 6, 1991, but because both parties sought adjournments, the motion was not heard until February 11, 1992. At that time, the Court held an evidentiary hearing on the issue of service of process and heard oral argument on all three issues.

## BACKGROUND

In July 1989, Rabbi Weiss, a New York rabbi, and six of his students traveled to Poland to protest the continued use of a building on the outskirts of the former Auschwitz concentration camp as a convent for Roman Catholic nuns of the Carmelite Order. The nuns had continued to use the convent despite an agreement entered into by certain Jewish leaders and Roman Catholic Bishops in Geneva in early 1987 to relocate the convent within two years.

On July 14, 1989, Rabbi Weiss and his students climbed over a seven-foot tall fence surrounding the convent grounds, knocked on the door, and camped out on the steps of the convent itself. The convent is cloistered, and church law prohibits its entrance by outsiders without the permission of the Mother Superior and the Bishop, permission which can be granted

only for special cause. Affidavit of Cardinal Jozef Glemp, sworn to on October 7, 1991, ("Glemp Aff."), ¶ 8. After Rabbi Weiss and his students had prayed for five hours, they were physically ejected from the convent grounds by maintenance workers at the convent who allegedly poured on them buckets of water mixed with urine. According to a published news account, Rabbi Weiss criticized his eviction from the convent grounds, accusing the nuns of being "silent while the workers beat on Jews—reminiscent of the silence of the Church during the Holocaust." D.D. Guttenplan, *Rabbi Asks Support of O'Connor*, Newsday, July 21, 1989 at 8, in the Affidavit of Kevin T. Baine, sworn to on October 26, 1991 ("Baine Aff."), Exh. A.

On August 26, 1989, Cardinal Glemp, who is the Primate of Poland, delivered a homily during a mass at Jasna Gora in Czestochowa, Poland. An English translation of the homily prepared by Origins, the CNS Documentary Service, is attached as an appendix to this Opinion. The translation indicates that in his homily Cardinal Glemp described the protest at the convent as follows:

> The Carmelite Sisters living beside the camp in Auschwitz wanted and want to be a sign of that human solidarity which includes the living and the dead. Do you not see, esteemed Jews, that intervention against them injures the feelings of all Poles and the sovereignty we gained with such difficulty? Your power is the mass media, which is at your disposal in many countries. Let them not serve to inflame anti-Polish sentiment.

According to the translation, Cardinal Glemp then made the following statement upon which this libel and defamation action is grounded:

> Recently, a detachment of seven Jews from New York attacked the convent at Auschwitz. To be sure, because they were restrained, it did not result in the killing of the sisters or the destruction of the convent; but do not call the aggressors heroes.

The mass was attended by some 100,000 people, and Cardinal Glemp's remarks received attention in media reports throughout the world.

On September 5, 1989, Alan M. Dershowitz, Esq., a professor at Harvard Law School and Plaintiff's counsel in this action, sent a letter to Cardinal Glemp which informed him that if he arrived in the United States he would be served with a complaint and required to appear in court to answer charges that he had defamed Rabbi Weiss.

On November 21, 1989, Mr. Dershowitz, on behalf of Rabbi Weiss, brought a criminal charge of defamation against Cardinal Glemp in the Regional Court in Czestochowa, Poland, based on the above-quoted language as it appeared in the original Polish. Thereafter, Mr. Dershowitz met *ex parte* with the Chief Judge and the Magistrate Judge of the Regional Court. On June 19, 1990, the Regional Court issued an opinion which dismissed Rabbi Weiss's complaint, giving a number of reasons other than those related to jurisdiction. Rabbi Weiss appealed the Regional Court's decision to the Province Court in Czestochowa, and Mr. Dershowitz was permitted by the Province Court to submit additional material in support of Rabbi Weiss's claim. On May 13, 1991, the Province Court affirmed the Regional Court's dismissal and assessed costs against Rabbi Weiss.

As early as August 1991, Cardinal Glemp had planned a pastoral visit to various parts of the United States arranged in part through Archbishop Maida of Detroit. *See* Glemp Aff., Exh. 3.

On September 25, 1991, Cardinal Glemp visited the Catholic diocese in Albany, New York. Upon his arrival in Albany, Cardinal Glemp was scheduled to attend a prayer service in the Cathedral of the Immaculate Conception, and then to meet with Jewish leaders on the premises of Cathedral. At around 10:50 a.m., Cardinal Glemp left the Cathedral Rectory in a procession to the Cathedral itself. He was flanked by Bishop Howard Hubbard, the Bishop of the Albany Diocese and Father Randall Patterson, the Chancellor of the Diocese, and followed by a retinue of other prelates. As the procession turned onto the sidewalk, a process server, Aline M. Frisch, approached

Cardinal Glemp and attempted to serve the summons and complaint in this action. The first part of this motion is addressed to that event.

## DISCUSSION

### I. SERVICE OF PROCESS

#### A. *Affidavits Filed in Connection with this Motion*

In support of his motion to dismiss for insufficiency of service of process, Defendant submitted affidavits of Cardinal Glemp, Father Patterson,[1] and David E. Scott, a reporter for the Albany diocesan newspaper *Evangelist.* In opposition to the motion, Plaintiff submitted affidavits of Aline M. Frisch and Renee E. Lewis, licensed process servers; Steven Jacobs, a free-lance photographer; and Rabbi Weiss.

#### 1. Cardinal Glemp

In his affidavit, Cardinal Glemp acknowledges that during the procession he saw a hand extending papers toward him, but states that he had no idea what the papers were. He assumed the papers were leaflets or fliers being passed out on the street. He states that the papers never touched him. Cardinal Glemp acknowledges that he surmised Rabbi Weiss might try to file a complaint against him during his visit to the United States based on the statements he had made in the homily. He states, however, that at the time it did not occur to him that someone was attempting to give him official court papers, and that no court papers were in fact given to him. Glemp Aff., ¶¶ 4–6. Cardinal Glemp did not appear at the February 11, 1992 hearing before this Court.

#### 2. Father Patterson

Father Patterson's supporting affidavit is to a similar effect, although he acknowledges seeing Mrs. Frisch with the paper, saying, "No, no," and raising his right hand, at which point he says the paper brushed against his right forearm and fell to the ground. He states that the paper never touched Cardinal Glemp and that he

did not think at the time that it was any type of court paper. Affidavit of Father Randall Patterson, sworn to on October 21, 1991, ¶¶ 6–8.

#### 3. David Scott

Mr. Scott's supporting affidavit indicates that he was standing 8 to 10 feet away from Cardinal Glemp when he saw a woman lunge toward Cardinal Glemp. He stated he could see that the paper never touched Cardinal Glemp; he did not hear the woman say anything; and it never entered his mind that she was attempting to deliver any official document to Cardinal Glemp. Affidavit of David E. Scott, sworn to on October 18, 1991, ¶¶ 3–7.

#### 4. Aline Frisch

In her opposing affidavit, Mrs. Frisch states that as Cardinal Glemp approached her outside of the Rectory, she said in a loud clear voice, "Cardinal Glemp"; after she spoke his name, Cardinal Glemp turned toward her; she "then said, also in a loud clear voice, 'I am an officer of the Court. I have legal papers for you'"; as she said these words, she was approximately one foot away from Cardinal Glemp, looking directly at him, making eye contact with him, and extending her right hand in which she held the summons and complaint in a legal blueback and folded; as she attempted to place the summons and complaint between Cardinal Glemp's left arm and his upper torso, she heard someone, possibly Cardinal Glemp, say, "No, no"; although she was less than one foot away from Cardinal Glemp and his entourage, she did not hear anyone say anything else; she saw the papers drop to the ground, due, she believes, to the priest on Cardinal Glemp's left knocking them to the ground with his hand; and she saw "someone in the entourage, who I believe was this same priest, pick the papers up off the ground and proceed with the Cardinal and others across the street and into the Cathedral." Affidavit of Aline M. Frisch, sworn to on November 18, 1991, ¶¶ 3–15.[2]

---

**1.** Father Patterson is of no known relation to the author of this Opinion.

**2.** At the hearing, Mrs. Frisch's affidavit was introduced in evidence as Defendant's Exhibit 2.

### 5. Renee Lewis

In her affidavit in opposition, Ms. Lewis states that she accompanied her colleague, Ms. Frisch to Albany to serve process on Cardinal Glemp; as Cardinal Glemp approached, she heard Ms. Frisch call out his name, "Cardinal Glemp"; she was approximately six feet from Cardinal Glemp, and Ms. Frisch was approximately one foot away from him; she heard Ms. Frisch say to him, "I am an officer of the Court. I have legal papers for you"; she saw Ms. Frisch attempt to place the papers between Cardinal Glemp's arm and his upper body and heard someone, possibly Cardinal Glemp himself, say "No, no, no"; she did not hear Cardinal Glemp or any of the persons in his entourage say anything else; she saw the priest to Cardinal Glemp's left put out his hand and knock the papers to the ground; she saw someone in the entourage then pick up the papers; and after the entourage entered the Cathedral, she returned to the place where service had been made to make sure that the papers had indeed been picked up, and there were no papers on the ground. Affidavit of Renee E. Lewis, sworn to on November 19, 1991, ¶¶ 3–14.[3]

### 6. Steven Jacobs

In his opposing affidavit, Mr. Jacobs states that on September 25, 1991, he was photographing Cardinal Glemp's visit to Albany; while waiting outside the Cathedral, Mrs. Frisch told him that she was going to serve a lawsuit on Cardinal Glemp; when Cardinal Glemp emerged from the Rectory, he was standing to the left of Mrs. Frisch, no more than 15 feet from her and Cardinal Glemp; Mrs. Frisch said something to Cardinal Glemp, although he does not remember what; he saw Cardinal Glemp look at Mrs. Frisch and at the paper she was trying to hand him; someone said, "No, no, no"; he saw an arm swat the papers to the ground; he believes someone from Cardinal Glemp's entourage knocked the papers to the ground; and when he left the Cathedral 30 minutes later, there were no papers on the sidewalk.

### 7. Rabbi Weiss

In his affidavit, Rabbi Weiss states that on September 16, 1991, he wrote a letter to Cardinal Glemp informing him that "unless there is a clear disassociation from the specific contents of your homily," he would cause papers to be served on Cardinal Glemp upon his arrival in the United States; he tried unsuccessfully to fax the letter to Cardinal Glemp before his departure for the United States, but he did fax the letter to the Polish Embassy, the Polish Press Agency, and the Solidarity newspaper; and on September 20, 1991, Rabbi Weiss went to Washington, D.C. where, during a peaceful demonstration, he saw Cardinal Glemp, called out to him, and told him he had papers for him and would serve them on him during his visit. Affidavit of Rabbi Avi Weiss, sworn to on November 18, 1991, ¶¶ 3–6.

### 8. Defendant's Supplemental Affidavits

On December 10, 1991, Defendant's counsel filed a supplemental affidavit in further support of the motion to dismiss, stating that after filing the motion to dismiss, he received a copy of a videotape provided by Channel 10, WTEN, of Albany, New York. The videotape contained raw video footage of the attempt to serve Cardinal Glemp with process and an accompanying audio portion. Defendant's counsel stated that, contrary to Mrs. Frisch's and Ms. Lewis's affidavits, the videotape demonstrated that Ms. Frisch did not say, "I am an Officer of the Court. I have legal papers for you." Rather, the videotape showed that Mrs. Frisch said, "You want this for the ...," at which point a male voice stated, "No." Supplemental Affidavit of Kevin T. Baine, sworn to on December 11, 1991 ("Baine Supp. Aff."), ¶¶ 2–3.

Accompanying counsel's affidavit were affidavits from Paul Ginsberg of Professional Audio Laboratories, Inc., who had enhanced the audio portion of the videotape; Professor Roger W. Shuy of Georgetown University's Linguistics Department, who had prepared a transcript of the enhanced audio tape; and Terrence P. Cavanaugh, the videographer for Channel 10

---

**3.** At the hearing, Ms. Lewis's affidavit was introduced in evidence as Defendant's Exhibit 5.

who filmed the incident and authenticated the videotape. Accompanying these papers were copies of the videotape, a tape of the audio portion of the videotape which had been "enhanced" by Mr. Ginsberg, and a transcript of that enhanced audio tape.

### B. *Testimony At the February 11 Hearing*

At the hearing, counsel agreed that Plaintiff had the burden of proof to show proper service of process.

#### 1. Aline Frisch

On direct examination, Mrs. Frisch testified that she has been a licensed process server for 12 years; she is the owner of M. Frisch Process Servers; and she has served over 500 summonses and complaints. She testified that in order to serve Cardinal Glemp, she travelled to Albany with Rabbi Weiss and Ms. Lewis, leaving at about 5 a.m. on September 25, 1991.

In her direct testimony, Mrs. Frisch described the actual service of process as she had in her earlier affidavit, except that she stated that Cardinal Glemp said, "No, no, no"; Ms. Lewis gave her the "thumbs up" signal after she served the summons; she saw a priest with white hair "holding the same papers that were swatted down on the sidewalk as he was walking up the church steps" into the Cathedral; and her "Affidavit of Service" said service occurred at 10:15 a.m.

On cross examination, Ms. Frisch stated she had touched Cardinal Glemp with the summons and complaint; the papers were stuck between his left arm and torso; and the papers were swatted down a few seconds later by someone. She stated she did in fact tuck the papers between Cardinal Glemp's arm and body, and in doing so she "felt" his body. Mrs. Frisch was then shown a photograph of her holding the summons and complaint, which was marked as Defendant's Exhibit 1. In the photograph, the papers are resting on the arm of a priest [Father Patterson], and it appears she is releasing the papers, as her thumb is in a raised position. Mrs. Frisch maintained she was in fact holding the papers with her four fingers and she was about to tuck the papers between Cardinal Glemp's arm and torso. She also stated that although her affidavit filed in opposition to this motion states that service occurred around 10:45 a.m., her "Affidavit of Service" stating the time as 10:15 a.m. is correct. She acknowledged she had not seen anyone pick up the summons and complaint from the ground, although her affidavit in opposition stated she had seen someone pick up the papers. Upon his being brought into the courtroom, she identified Father Patterson as the priest who she said was holding the papers as he walked up the steps to the Cathedral. Mrs. Frisch was then shown the Channel 10 videotape, which was marked as Defendant's Exhibit 4. She acknowledged that the videotape depicted where and when the service of process occurred and that at one point it depicts her arm extended to make service of process.

#### 2. Renee Lewis

Ms. Lewis's direct testimony also followed closely the statements made in her affidavit. She stated that Mrs. Frisch, who is her regular contractor for process service work, placed the papers between Cardinal Glemp's left elbow and body and that the papers remained there for several seconds; she then saw the papers hit the ground; and before she was able to look up, she saw a hand come down and pick them up.

On cross examination, Ms. Lewis testified she could not remember Mrs. Frisch's specific words; while it was possible that Mrs. Frisch said, "You want this for the . . .," "from my training and the training she has given us she would definitely declare exactly why she was there and what she was doing." Ms. Lewis stated she wrote out her affidavit herself; it was typed from her notes; and it was basically in her words. When Defendant's counsel pointed out that Ms. Lewis' affidavit and Mrs. Frisch's affidavit had many word-for-word similarities, the witness maintained that it was only because she and Mrs. Frisch had made the same observations. When confronted with the statement in her affidavit that she returned to the spot to

double check that the papers were picked up, she maintained she was sure she had seen the papers picked up earlier by a man. She described the man who picked up the papers as between 5′9″ and 5′11″ with light colored hair, medium build and glasses. [The Court notes that this description could fit Father Patterson.]

### 3. Terrence Cavanaugh

Testifying for the defendant, Mr. Cavanaugh stated he was employed by WTEN TV in Albany as a videographer and was assigned to cover the events related to Cardinal Glemp's visit on September 25, 1991; he used a Sony SP Betacam with both a stick microphone and a shotgun microphone attached thereto which he operated wide open on manual mode; those microphones picked up sounds of traffic, people walking, an umbrella opening, as well as voices; he filmed the scenes shown on the videotape marked as Defendant's Exhibit 4; he was four to five feet away at the time at which the piece of paper and Mrs. Frisch's arm appear on the videotape; he heard a male voice saying, "No, no"; the voice he heard before that was the woman who was holding the subpoena; he recognized it because he had spoken to the woman earlier; the microphones were positioned in such a way as to pick up whatever Mrs. Frisch said while she held out the paper and immediately before that event; and Mrs. Frisch was speaking in a normal tone.

On cross examination, Mr. Cavanaugh acknowledged that at the time he was filming the event, he was not aware Mrs. Frisch was speaking as she spoke, but became so aware by reviewing the film afterwards. He stated, however, that the microphones would be pointed at whatever he was shooting or wherever the camera is pointing towards; the range of the camera is twelve feet; and although a voice might be less "legible" [sic—"audible"], the microphone would still pick up a voice of a person whose back was turned to the camera. Mr. Cavanaugh stated that each microphone was recorded on a different audio track, and the videotape marked as Defendant's Exhibit 4 contained a merged version of the two separate audio tracks as a normal production procedure when making VHS dubs. The witness acknowledged that in listening to the tape he had been unable to discern the words spoken by the woman but, after adjusting the treble and base, he thought maybe she said "Corbett" or "Court." He maintained he knew that it was Mrs. Frisch's voice from his knowledge of how his equipment performs and his familiarity with her voice from speaking to her earlier.

On redirect examination, Mr. Cavanaugh testified that if Mrs. Frisch had said, "Cardinal Glemp, I am an Officer of the Court. I have legal papers for you," his sound equipment would have picked all of that up.

After this testimony, the defendant offered Exhibit 4 in evidence, and Plaintiff's counsel objected on the grounds that because the two audio tracks had been merged, the witness was not in a position to verify that the tracks had not been altered. Plaintiff's counsel acknowledged having stipulated that the videotape was admissible evidence, but stated that at the time of the stipulation they had not known the two audio tracks had been merged. The Court admitted Exhibit 4 for a limited purpose, namely, to determine whether there had been sufficient time for Mrs. Frisch to make the statements she testified she made, but not for the content of the words spoken on the merged audio track. The Court requested that Defendant furnish the two separate audio tracks so that the Court could determine whether Exhibit 4 was admissible for purposes of showing the content of the words spoken.

### 4. Professor Shuy

Defendant called Roger Shuy, Professor of Linguistics at Georgetown University, as an expert witness. Professor Shuy testified as to the methodology he uses to decipher "hard-to-hear passages" by a means of phonetic analysis of each syllable articulated. He stated he had used this methodology to decipher Defendant's Exhibit 8, a tape of the audio portion of Defendant's Exhibit 4 which had been "enhanced" by Paul Ginsberg. Professor Shuy testified that at first he had trouble

making a phonetic translation, but after making several passes he was confident with a reasonable degree of certainty that he had deciphered the only spoken words on the sound track as follows. As the procession left the Rectory, a male voice said, "Be careful. Better keep this on." As the procession made a right turn off the Rectory walkway onto the street sidewalk and as a hand containing some object comes out of the side of the screen, a female voice said, "You want this for the ..." A male voice said, "No," another male voice said, "No, no, no," and a female voice sounding like the first female voice said, "No?" He also testified he found nothing similar to "Cardinal Glemp, I am an Officer of the Court. I have legal papers for you" on any of the tapes. He pointed out that such a statement itself would in his estimation take 4 seconds to make, and the female's speech is not that long. He also testified he heard nothing remotely like, "Cardinal," "Glemp," "officer," "court," "legal," or "papers."

### 5. Father Patterson

Father Patterson testified that when Cardinal Glemp and Bishop Hubbard left the doorway of the Rectory at about 10:45 am, they were fifteen minutes late for a prayer service; as they made a right turn onto the sidewalk going over to the Cathedral, someone offered a piece of paper for Cardinal Glemp, and not wanting to be delayed further, he deflected the paper and said, "No, no"; Bishop Hubbard also said, "No"; he had no idea what the paper was; the paper fell to the ground without touching Cardinal Glemp; he did not pick up the paper; to the best of his knowledge, after making inquiry, no other person in the entourage had picked up the paper; he has never seen the paper again; and the person offering the paper did so in a hesitant way.

On cross examination, Father Patterson acknowledged he was aware of the possibility that if Cardinal Glemp came to the United States he could be served with a lawsuit, and he had been instructed by Bishop Hubbard that no one was to accept service of a summons for Cardinal Glemp,

but rather Cardinal Glemp must receive it for himself. He stated, however, that he and Bishop Hubbard did not flank Cardinal Glemp to protect him from service of process, but that it was church custom for a visiting dignitary to be flanked by two local priests. Father Patterson stated that despite the presence of the woman's voice on Exhibit 4, to the best of his recollection the woman said nothing, and the movement of his arm prevented the paper from reaching Cardinal Glemp.

Father Patterson denied that it was part of his job that day to protect Cardinal Glemp from having process served on him. He stated his understanding of his instructions from Bishop Hubbard was that if someone had come to the residence where Cardinal Glemp was going to have lunch and said, "I have a summons to serve Cardinal Glemp," he was not to accept service of process for Cardinal Glemp, but would have said, "Excuse me," told Bishop Hubbard and Father Erdmon, a translator, and afterward accompanied Cardinal Glemp, and presumably Father Erdmon, to the door to receive the summons. He stated he did not recall any instructions from Bishop Hubbard concerning any attempts to serve Cardinal Glemp elsewhere. He also stated he had never seen a summons before. Stating he had alerted the local media himself the day before the Cardinal's visit, he denied any knowledge members of the media were present that day because they believed the summons might be served.

Plaintiff's counsel then showed Father Patterson what was marked as Plaintiff's Exhibit 12, a videotape without sound [4] which Plaintiff's counsel had obtained from Channel 4 [NBC] in Boston. Father Patterson held to his position that the summons touched him and not Cardinal Glemp. He acknowledged he had been told by Bishop Hubbard that the Bishop had said "No," and stated he had no independent recollection of hearing the Bishop utter those words.

### 6. David Scott

Mr. Scott testified he did not hear Mrs. Frisch say anything during the attempted

---

**4.** The sound had apparently been erased during      processing for use in broadcasting.

service, although he was standing 8 to 10 feet away; the incident took a second to a second and a half; and he did not realize service of process was being attempted. On cross examination, he acknowledged he did not hear anyone say anything and did not see the papers leave the woman's hand.

The parties then agreed to present to the Court the two separate audio tracks which had been merged together in Defendant's Exhibit 4, and Plaintiff reserved the right to call a technician if one sound track was different from the other. The separate audio tracks have since been furnished to the Court. Plaintiff has not exercised his reserved right, and the Court has listened to the audio tracks separately. The parties having stipulated to its admissibility, the Court also received in evidence the videotape marked as Plaintiffs' Exhibit 12, and the Court has reviewed it carefully. These videotape exhibits weigh heavily in the Court's determinations herein.

C. *Findings of Fact*

The Court makes the following findings of fact with regard to the motion to dismiss for lack of jurisdiction and insufficient service of process.

Mrs. Frisch at no time stated, "Cardinal Glemp, I am an Officer of the Court. I have legal papers for you," or words having a similar connotation.

Mrs. Frisch at no time made it clear she was serving legal process. She did make it clear by her actions that she was intent on giving something to Cardinal Glemp. She did not make it clear to other individuals who were present but unconnected with her that those papers were legal process, nor did she make clear she was an officer of the court.

The separate audio tracks which had been merged in the videotape marked as Defendant's Exhibit 4 were presented to the Court after the hearing, and they are clearer than the merged version played at the hearing. The separate tracks confirm Professor Shuy's version of the statement made in the female voice. The Court's examination of the videotapes marked as Defendant's Exhibit 4 and Plaintiff's Ex-

hibit 12 shows that Ms. Frisch is the only woman in close vicinity to the procession, although Ms. Lewis and a female photographer are nearby. From the time that Cardinal Glemp left the Rectory to the time of the supposed service of process, the audio tracks do not reflect any other utterances spoken in a female voice.

At no time were the papers tucked between Cardinal Glemp's torso and arm as Mrs. Frisch and Ms. Lewis testified. Defendant's Exhibits 1 and 4, and, in particular, Plaintiff's Exhibit 12, make clear that Mrs. Frisch released the papers before ever placing them in such a position. Plaintiff's Exhibit 12 shows the papers falling to the ground, and it does not show the papers being placed between Cardinal Glemp's torso and arm. No one in the procession immediately near Cardinal Glemp stooped to pick up the papers at that time. Defendant's Exhibit 4 shows Father Patterson walking up the steps to the Cathedral, but he is not carrying any papers at that time.

Mrs. Frisch's own testimony contained many inconsistencies, and her demeanor on the stand was not that of a credible witness. Ms. Lewis's demeanor was somewhat better than Mrs. Frisch's. However, her answers to certain questions, particularly those relating to the close resemblance of phraseology in, and the wording of, her affidavit and Mrs. Frisch's affidavit, and her testimony, like Mrs. Frisch's, that the legal papers were actually placed between Cardinal Glemp's torso and his left arm, were false. The Court finds the answers by both these witnesses as to matters of material fact were intentionally false. Accordingly, the Court rejects in its entirety the testimony of both witnesses.

Nor does the evidence support Plaintiff's suggestion that Cardinal Glemp was trying to evade service during his visit to Albany. There is no evidence that Cardinal Glemp's visit to the United States was fleeting or furtive, as he made a public visit to Washington four days earlier, and Father Patterson had notified the press of Cardinal Glemp's visit to Albany the day before his arrival. Exhibits to Cardinal Glemp's affidavit also indicate he had appeared with

Jewish leaders in Washington and a similar meeting with Jewish leaders had been planned to take place that day at the Cathedral in Albany. *See* Glemp Aff., Exh. 4. The letter written by Mr. Dershowitz threatening Cardinal Glemp with service of a lawsuit upon his arrival in the United States is not adequate evidence that Cardinal's Glemp was imminently aware that service of process on him would be attempted. That letter was written on September 5, 1989, two years before Cardinal Glemp's September, 1991 visit to this country. Affidavit of Alan M. Dershowitz, sworn to on November — [sic], 1991, ("Dershowitz Aff.") ¶ 3, Exh. A. Neither does Rabbi Weiss's affidavit provide evidence Cardinal Glemp heard of, knew of, or understood about the threatened service of process.

### D. *Conclusions of Law*

■ Plaintiff's sole basis for asserting Court's jurisdiction over the Defendant is that Cardinal Glemp was personally served with process in this action in New York. Personal service upon an individual within the jurisdiction of the court constitutes a valid basis for the assertion of personal jurisdiction. *Burnham v. Superior Court of California*, 495 U.S. 604, 110 S.Ct. 2105, 109 L.Ed.2d 631 (1990).

■ Plaintiff brought his complaint in New York State Supreme Court, and Defendant removed to this Court. In determining the validity of service prior to removal, a federal court must apply the law of the state in which the service was made. *Bomze v. Nardis Sportswear, Inc.*, 165 F.2d 33 (2d Cir.1948). *Accord* 4A Charles A. Wright and Arthur R. Miller, *Federal Practice and Procedure*, § 1082 at 5–6 (1987). The method of service must also be measured against principles of due process and must be "reasonably calculated, under all the circumstances, to apprise [the] interested part[y] of the pendency of the action." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950). *See also Bossuk v. Steinberg*, 58 N.Y.2d 916, 460 N.Y.S.2d 509, 510, 447 N.E.2d 56, 58 (1983).

■ New York's applicable statutory standard, set forth in New York Civ.Prac. L & R. ("CPLR") § 308(1), provides, "Personal service upon a natural person shall be made ... by delivering the summons within the state to the person to be served." Service by personal delivery must be clear and unequivocal so that a reasonable defendant knows he or she has been served with process. *In re Will of Bonesteel*, 16 A.D.2d 324, 228 N.Y.S.2d 301 (3d Dep't 1962). *See also Bossuk*, 460 N.Y.S.2d at 510, 447 N.E.2d at 58.

New York courts have interpreted the delivery requirement of § 308 strictly. For example, in *McDonald v. Ames Supply Co., Inc.*, 22 N.Y.2d 111, 291 N.Y.S.2d 328, 238 N.E.2d 726 (1968), the New York Court of Appeals voided service on a corporation's managing agent where the process server left the summons with an employee in the corporation's office building. In *Macchia v. Russo*, 67 N.Y.2d 592, 505 N.Y.S.2d 591, 592, 496 N.E.2d 680, 681 (1986), the Court rejected service by delivery to the defendant's son, even when the son actually gave the papers to his father, noting, "where plaintiff chooses to make service by personal delivery to defendant the statutory requirements could not be plainer ..." The Court in *Board of Education of Liverpool Cent. School Dist. v. Sobol*, No. 90 Civ. 198, 1991 WL 22320 at *4, 1991 U.S.Dist. LEXIS 2110 at *11 (N.D.N.Y. Feb. 19, 1991), held service improper where the process server left the summons in an envelope on a desk in an empty conference room, "especially when the server failed to announce the purpose of her venture."

There is some flexibility in the requirements of § 308 when a defendant resists service. *See Bossuk*, 460 N.Y.S.2d at 510, 447 N.E.2d at 58 (holding "where the person to be served interposes a door between himself and the process server, the latter may leave the summons outside the door, provided the person to be served is made aware that he is doing so"); *Francis S. Denney, Inc. v. I.S. Laboratories, Inc.*, 737 F.Supp. 247, 248 n. 1 (S.D.N.Y.1990) (leaving an order to show cause outside a door

held to be proper delivery under § 308(1) when the recipient slammed the door and knowingly refused to open it to accept service). However, there is insufficient evidence here for the Court to find that Defendant was resisting service. To the contrary, by meeting openly with Jewish leaders in the United States, Cardinal Glemp's conduct indicates he was not trying to evade service.

The Court concludes the attempted service was not effected "in a way reasonably calculated to apprise" Cardinal Glemp, or the persons accompanying him, that service of process was being attempted. The papers proffered by Mrs. Frisch could just as well have been a petition, a leaflet, a protest, or another non-legal document. Because the evidence does not show Cardinal Glemp attempted to evade service, the cases cited by Plaintiff involving defendants determined to evade process are not applicable here.

Plaintiff's subsequent mailing of the summons and complaint to Cardinal Glemp did not constitute effective service. "Service of process must conform to the requirements listed in the relevant subsection of CPLR § 308 in order to confer personal jurisdiction over a defendant, regardless of whether the defendant actually receives the documents by some other means." *Sobol*, 1991 WL 22320 at *3, 1991 U.S. Dist. LEXIS 2110 at *9 (citing *Raschel v. Rish*, 69 N.Y.2d 694, 512 N.Y.S.2d 22, 24, 504 N.E.2d 389, 390 (1986)). Accordingly, because Cardinal Glemp was not properly served with process in this action, the motion to dismiss for insufficient process and lack of personal jurisdiction is granted.

## II. RES JUDICATA AND COLLATERAL ESTOPPEL [5]

Defendant argues that because Rabbi Weiss chose to litigate his claim against Cardinal Glemp in the courts of Poland and lost his case on the merits, he is barred by principles of res judicata and collateral estoppel from relitigating his claim in this Court.

### A. *The Polish Action*

Rabbi Weiss, represented by Mr. Dershowitz, brought an action against Cardinal Glemp on November 21, 1989 in the Regional Court in Czestochowa, Penal Department, in Czestochowa, Poland. In his "Notice of Legal Claim," [6] Rabbi Weiss sought to invoke the Polish penal code, accusing Cardinal Glemp of "the crime defined in Article 178, Section 1 or 2, of the Penal Code." Rabbi Weiss stated that Cardinal Glemp's statement in his homily "has caused a serious harm to my reputation as [I am] a man of peaceful character, and because of that I decided to defend my good name through means stipulated under Polish law." He stated his motivation in bringing the claim was not revenge and, "My only goal is to defend my reputation from a false allegation." Rabbi Weiss also noted, "I do not seek a punitive fine, and especially not a prison term," and he was "only interested in a court decision stating I have been falsely slandered."

The Regional Court dismissed the claim by opinion,[7] finding that: Rabbi Weiss's accusation against Cardinal Glemp did not clearly infer Cardinal Glemp intended to slander Rabbi Weiss; "In the fragment of the homily noted by the Plaintiff, the fragment which became the cause of the claim, there is no statement describing the intentions"; Cardinal Glemp's statement of effects which in actuality did not take place was meant to protest against regarding the attackers as heroes; all descriptions and statements in the sentence were subordinated to the thought expressed in the last part of the sentence, i.e., regarding the attackers as heroes; and Cardinal Glemp's statement in Polish expresses the thought that the actual intentions of the attackers were not known and could not be learned

---

5. The Court rules on the remaining parts of Defendant's motion only because of the likelihood of an appeal of its ruling that personal jurisdiction does not lie.

6. Rabbi Weiss' "Notice of Legal Claim," is annexed to the Affidavit of Kevin T. Baine, sworn to on October 21, 1991, Exh. C.

7. *See* "Decision of Regional Court in Czestochowa," annexed to Baine Aff., Exh. D.

because the attackers were stopped. In that portion of its opinion, the Court stressed Cardinal Glemp's use of the word "Lub" ["or"], as meaning that the statement of effects which did not take place were mentioned only by way of example, and thus to indicate that the real intentions of Rabbi Weiss and his students were not known to Cardinal Glemp.[8]

The Regional Court decision took the position that Cardinal Glemp's statements were statements either made within the bounds of his authority, made while performing his duties, or made with the purpose of explaining or defending the rights of others, in this case the rights of the Carmelite Sisters, and such statements do not constitute slander actionable under the Penal Code. Further, the Court found Rabbi Weiss's conduct amounted to disturbance of "the peace of the house," which appears to be a crime similar to criminal trespass, and was a violation of the Penal code. The Court also found that since Rabbi Weiss was not mentioned by name, his accusation that he was slandered did not match reality.[9]

The Province Court in Czestochowa reviewed the Regional Court's decision and Rabbi Weiss's "Statement in Supplement to the Appeal."[10] In its decision,[11] the Province Court summarized Rabbi Weiss' position on appeal as follows:

> In his conclusion, the author of the appeal states that the filed legal claim fulfilled all the requirements necessary "to initiate legal proceedings on the basis of Article 178, Section 1, of the Penal Code" and that "the decision to immediately dismiss" his "claim and dismiss the proceedings in the case of the claim of slander, filed against Cardinal Jozef Glemp, constitutes a violation of" his "right to

avail himself of the justice system, because it [the decision] erroneously deprives" him "of the opportunity to provide evidence in support of" his "legal claim (formulated in accordance with the regulations) stating that Article 178, Section 1, of the Penal Code has been violated and to claim compensation for the damages" he "suffered."

In dismissing Rabbi Weiss' appeal, the Province Court held that the Regional Court Chief Justice had properly determined, under Article 299, Section 1, of the Penal Procedure Code, that Rabbi Weiss's claim lacked certain elements, and that he properly did not refer the case for a public trial, but referred it to a "session" for determination of whether there were grounds for judging the case at a trial. The Province Court held, for the reasons stated in the lower court's opinion, that the Regional Court was correct in finding Cardinal Glemp's acts did not bear the marks of an act prohibited by law. It stated that it fully supported those reasons, particularly because "Cardinal Glemp, as head of the Roman Catholic Church in Poland, had the right to express his position on the subject of the incident on the premises of the Carmelite convent in this case, when the 'peace of the house' has indeed been disturbed (Article 271 of the Penal code)."

## B. *The Parties' Arguments*

Defendant argues that because Rabbi Weiss litigated the prior Polish action, the Uniform Foreign Country Money–Judgments Recognition Act ("the Act"), bars him from pursuing his claim before this Court. The Act provides for the recognition by New York courts, subject to certain exceptions, of:

---

**8.** Defendant argues that the Regional Court's analysis of Cardinal Glemp's statement is very similar to the analysis required in American courts for a finding of actual malice in statements made regarding a public figure. *See New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). He argues that Rabbi Weiss was, or by his actions at the convent caused himself to become, a public figure under *New York Times Co. v. Sullivan.*

**9.** This finding itself seems to lack reality in view of the publicity attendant to Rabbi Weiss's acts at the convent.

**10.** The "Statement in Supplement to the Appeal" is annexed to the Baine Supp.Aff., Exh. F.

**11.** The "Decision of Province Court in Czestochowa" is annexed to the Baine Aff., Exh. E.

, any judgment of a foreign state granting or denying recovery of a sum of money, other than a judgment for taxes, a fine or other penalty, or a judgment for support in matrimonial or family matters. CPLR § 5301(b). Defendant asserts the Polish action does not fall within any of the limited exceptions to the Act, and "mere divergence from American procedure does not render a foreign judgment unenforceable." *Pariente v. Scott Meredith Literary Agency, Inc.*, 771 F.Supp. 609, 616 (S.D.N.Y.1991).

Defendant also argues that even though Rabbi Weiss invoked the Polish penal law, the Act still applies to bar his claim because his suit did not truly seek penal relief. "Essentially civil claims should never be denied extrastate enforcement merely because the epithet penal can be attached to them." Robert A. Leflar, *Extrastate Enforcement of Penal and Government Claims*, 46 Harv.L.Rev. 193, 202 (1932). As Judge Cardozo observed for the Court in *Loucks v. Standard Oil Co.*, 224 N.Y. 99, 102, 120 N.E. 198 (1918):

> [T]he question is not whether the statute is penal in some sense. The question is whether it is penal within the rules of private international law. A statute that is penal in that sense is one that awards a penalty to the state, or to a public officer in its behalf, or to a member of the public, suing in the interest of the whole community to redress a public wrong.

Therefore, "actions brought by a private person or public body to recover compensation for a loss" are not penal actions for purposes of enforcement of foreign judgments. Restatement (Second) of Conflict of Laws, § 89, comment a.

Defendant points out that in his "Notice of Legal Claim," Rabbi Weiss stated his goal was "to defend my reputation." He also explicitly foreswore relief in the form of a punitive fine or a prison term. Baine Aff., Exh. C. Thus, because the purpose of his claim was reparation to one aggrieved rather than vindication of the public interest, his claim was not penal in the private international law sense. *See* Barbara Kul-zer, *Recognition of Foreign Money Judgments in New York: The Uniform Foreign Money–Judgments Act*, 18 Buff. L.Rev. 12 (1969).

Defendant also notes that in his "Statement in Supplement to the Appeal" to the Province Court, Rabbi Weiss asserted his right to receive "compensation for the damages caused to me." Baine Supp. Aff., Exh. F. Defendant provides opinions of experts in Polish law stating that in the Polish legal system, a defamed individual may initiate a criminal or a civil proceeding, or he may join a civil claim for damages with a criminal complaint. Affidavit of Rett R. Ludwikowski, sworn to on December 11, 1991, ¶ 3; Affidavit of Bozena Sarnecka–Crouch, sworn to on December 11, 1991, ¶ 6. Defendant argues that because Rabbi Weiss added a request for compensatory damages, the Province Court could have awarded damages had it concluded the claim had merit.

Alternatively, Defendant argues that even if Rabbi Weiss had not requested damages in the prior action, he is barred from pursuing a civil damages claim here because he had the right to demand damages and failed to do so. *Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 398, 101 S.Ct. 2424, 2428, 69 L.Ed.2d 103 (1981) (holding res judicata bars the subsequent litigation not only of all claims that were in fact pursued in the prior litigation, but also of all claims that could have been raised in the earlier case based on the same facts).

Plaintiff denies application of the Act, arguing the prior Polish action was a penal proceeding, and the Act applies only to money judgments. Furthermore, he argues that common law rules of claim and issue preclusion give no preclusive effect whatsoever to a prior penal or criminal proceeding which ended in defendant's favor in a subsequent civil action. *Helvering v. Mitchell*, 303 U.S. 391, 58 S.Ct. 630, 82 L.Ed. 917 (1938); *Neaderland v. Commissioner*, 424 F.2d 639 (2d Cir.), *cert. denied* 400 U.S. 827, 91 S.Ct. 53, 27 L.Ed.2d 56 (1970); *Restatement (Second) of the Law of Judgments*, § 85, comment a at 295 (1982). The cases cited by Plaintiff, how-

ever, pertain to the preclusive effect of prior *domestic* criminal actions. They do not relate to the preclusive effect of foreign proceedings denominated penal which are brought by individuals in their own name rather than by the state, as is required in this country. Plaintiff fails to rebut Defendant's argument that merely attaching the label "penal" to a claim does not necessarily make it a penal action in the private international law sense.

Rabbi Weiss also argues that he sought only criminal penalties when he initiated the action in the Regional Court in Poland. In support of this, he provides affidavits from experts on Polish law which indicate that the statement "I am seeking compensation for damage to my reputation" in a "Notice of Legal Claim" does not convert a criminal proceeding to a civil proceeding. *See* Second Affidavit of Stanislaw Pomorski, sworn to on January 15, 1992, and Exhibits. Plaintiff fails, however, to rebut Defendant's argument regarding the addition in his "Statement in Supplement to the Appeal" of the phrase "compensation for the damages caused to me."

Finally, Plaintiff claims that because he did not have a full and fair opportunity to contest the Polish decision now said to be controlling, he cannot be precluded from pursuing the instant action. *Gilberg v. Barbieri*, 53 N.Y.2d 285, 441 N.Y.S.2d 49, 51, 423 N.E.2d 807, 809 (1981). Plaintiff claims he did not have a full and fair opportunity to litigate the prior action because: (1) in the face of intense pressure from Cardinal Glemp's supporters, he and his attorneys could not find a single lawyer to assist them in Poland; (2) after waiting for months, he and his lawyers learned Cardinal Glemp was never required to respond to his accusations;[12] (3) the Polish courts never held any hearing on his claims; (4) the Polish courts did not request any evidence or argument related to his claims; and (5) Cardinal Glemp never submitted to the jurisdiction of the Polish courts. In light of this procedural inequity, Plaintiff argues the Polish proceedings were a "travesty," and should not have any bearing on this litigation.

An opposing affidavit by Mr. Dershowitz states that he attended an informal meeting with the Chief Judge of the Regional Court in Czestochowa and the Magistrate Judge assigned to the case, and that:

> During the meeting, the judges expressed to me in clear and unambiguous terms that they were under enormous pressure to dismiss the case. They described the case as a scandal in Poland, and said that it would be difficult to get Cardinal Glemp to submit to the jurisdiction of any court because he was so powerful. They also told me that an amnesty had been issued which protected Cardinal Glemp.

Dershowitz Aff., ¶ 5–6.

These statements, however, are contradicted by Mr. Dershowitz's account of the same meeting in his book *Chutzpah*, wherein he recounts that the judges:

> asked me to argue several technical legal points: whether a recent amnesty provision of Polish law applied to Cardinal Glemp's actions, whether a cardinal could be sued in a Polish court. I was prepared to address these concerns and did so for the better part of an hour. At the end, to my surprise, the judges both said they agreed with our position. The suit could be brought and Cardinal Glemp would have to answer.
>
> The Judges also seemed to agree that it was clear, as a matter of fact, that Rabbi Weiss had come to Auschwitz intending to conduct a peaceful sit-in and that it was false to accuse him of setting out to murder the nuns. The judges both said that they hoped Cardinal Glemp would decide to issue a retraction and thereby settle the suit. "That would made me very happy," said the Chief Judge. I told them that I, too, preferred a settlement, but that we would not withdraw our suit without a retraction.

---

12. Whether the filing of a complaint of violations of the Polish penal code requires the accused to respond is unclear.

After we left the courthouse, pressure was obviously placed on these judges. In a written decision delivered several weeks later, they completely changed their tune ruling that there was no proof that Cardinal Glemp's remarks were directed against Rabbi Weiss.

Alan M. Dershowitz, *Chutzpah* 159–160 (1991), in Baine Supp. Aff., Exh. G. Contrary to the statements in his affidavit, nowhere in *Chutzpah* does Mr. Dershowitz state that the judges told him during the meeting "in clear and unambiguous terms that they were under pressure to dismiss the case." Rather, in *Chutzpah*, Mr. Dershowitz suggests that pressure was not put on the judges until after the meeting. The Court also notes that in his affidavit Mr. Dershowitz implies that an amnesty had issued which had prevented the Polish judges from granting justice to Rabbi Weiss, while in *Chutzpah* he indicates that the judges agreed with him that the amnesty did not apply. Suffice it to say, no amnesty provision is referred to in the judicial opinions. Discrepancies of this nature from an officer of the court are troubling, to say the least.

### C. *Discussion*

If normal access to the courts prevailed during the prior litigation, and if it appeared Rabbi Weiss' claim was decided on the merits under a standard of proof for a civil action similar to that in this country, Rabbi Weiss' earlier choice of Poland as a forum in which to seek "compensation for the damages caused to me" would be binding. In such a situation, he would be precluded from bringing a slander claim here, at a time long past the one year period prescribed by the New York Statute of Limitations. *See* CPLR § 215. Nevertheless, the Court takes judicial notice that Cardinal Glemp is now an extremely important and powerful figure in Poland, that anti-semitism exists in Poland,[13] and that it might well be difficult for an American rabbi to initiate civil proceedings against Cardinal Glemp in that country. The Court also takes judicial notice that, in many countries from time to time, attorneys' and judges' fears have resulted in sham proceedings. Whether there is adequate evidence that such a situation existed in Poland in 1989–90 to the extent that court process was a travesty, however, is another question.

Foreign law is a question of fact which must be proved. *Werfel v. Zivnostenska Banka*, 287 N.Y. 91, 38 N.E.2d 382 (1941). Accordingly, because the affidavits of the experts on Polish law do not fully satisfy the Court, the motion to dismiss on grounds of preclusion is denied without prejudice, subject to a hearing being held if this Court is reversed on the issue of personal jurisdiction. At such a hearing, Defendant may present the evidence as to Polish substantive and procedural law, and Plaintiff may present evidence of the deprivations of proper process which he claims occurred in the prior Polish proceedings.

### III. FORUM NON CONVENIENS

Defendant argues this action should be dismissed on grounds of *forum non conveniens*. In *Gulf Oil v. Gilbert*, 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947), and the companion case of *Koster v. (American) Lumbermens Mut. Casualty Co.*, 330 U.S. 518, 67 S.Ct. 828, 91 L.Ed. 1067 (1947), the Supreme Court set forth the rule that a plaintiff's choice of forum should rarely be disturbed on grounds of *forum non conveniens*. However, when there is an alternative forum to hear the case, and when trial in the chosen forum would be oppressive and vexatious to the defendant out of all proportion to the convenience to the plaintiff, or when the chosen forum is inappropriate because of considerations affecting the court's own administrative and legal problems, the court may, in the exercise of its sound discretion, dismiss the case. *Gulf Oil*, 330 U.S. at 508–09, 67 S.Ct. at 843. *Accord Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241, 102 S.Ct. 252, 258, 70 L.Ed.2d 419 (1981).

**13.** *See* Konstanty Gebert, *Anti–Semitism in the 1990 Polish Presidential Election*, 58 Soc.Res. 723 (1991).

■ The determination of whether there is an alternative forum ordinarily involves a consideration of whether the defendant seeking dismissal is amenable to process in the other jurisdiction. However, even if the defendant is subject to jurisdiction in the transferee court, "where the remedy offered by the other forum is clearly unsatisfactory, the other forum may not be an adequate alternative." *Piper Aircraft*, 454 U.S. at 255 n. 22, 102 S.Ct. at 265 n. 22.

■ In light of these requirements, Rabbi Weiss' allegations that Cardinal Glemp was never required to submit to the jurisdiction of the Polish courts, that the Polish proceedings were a travesty, and that he was unable to obtain any legal representation in Poland in order to present his claims[14] are significant considerations on a motion requiring application of *forum non conveniens.* At oral argument, the Court asked Defendant's counsel whether Cardinal Glemp would accept process in Poland. Thereafter, the Court received a letter from Defendant's counsel stating that in its opinion the Polish courts would have jurisdiction over Cardinal Glemp in a case brought by Rabbi Weiss alleging libel and slander. Letter to the Court from Kevin T. Baine, dated February 24, 1992. This letter is not responsive to the Court's question, and it is not clear to the Court that Cardinal Glemp would accept civil process in Poland. Accordingly, Defendant has not shown Poland is a viable alternative forum. *See Schertenleib v. Traum*, 589 F.2d 1156, 1159-60 (2d Cir.1978) (holding "a district court should not dismiss on grounds of *forum non conveniens* unless it justifiably believes that the alternative forum will take jurisdiction if the defendant consents).

■ *Forum non conveniens* also involves consideration of various "private interest factors" affecting the convenience of the litigants and "public interest factors" affecting the convenience of the forum. *Gulf Oil*, 330 U.S. at 508-509, 67 S.Ct. at 843. These factors include the ease of access to sources of proof, the convenience of parties and witnesses, and avoidance of problems involving the application of foreign law. *Gulf Oil*, 330 U.S. at 508, 67 S.Ct. at 843. *Accord Piper Aircraft*, 454 U.S. at 241-242 n. 6, 102 S.Ct. at 258-259 n. 6.

Examining the convenience of witnesses involves consideration of the two claims made by Plaintiff in this action. The first is an ordinary slander claim; the second is a claim that Cardinal Glemp knowingly released his homily to the press and knew or should have known it would be widely disseminated in the international media, including to *The New York Times.* Plaintiff argues that his second cause of action in particular requires trial of this action in this forum, because he is domiciled and was damaged in New York, and witnesses to that damage, as well as the students who accompanied him to Poland, are from New York. Defendant argues its witnesses as to the meaning of Polish words and as to what Cardinal Glemp actually said, reside in Poland. Any witnesses of actions by Cardinal Glemp, if any, taken to cause the international media to print his remarks also reside in Poland.

Plaintiff argues New York law applies. Defendant argues Polish law applies. Even assuming Polish law applies, it appears that the balance of convenience favors Plaintiff's choice of forum.

Accordingly, Defendant's motion to dismiss on *forum non conveniens* grounds is denied.

## CONCLUSION

Defendant's motion to dismiss for insufficiency of service of process is granted. The motions to dismiss on grounds of preclusion and *forum non conveniens* are denied.

IT IS SO ORDERED.

## APPENDIX

1. Wisdom Is the Foundation of Harmony

"From of old I was poured forth, at the first, before the earth" (Prv. 8:23). These

---

**14.** *See* Dershowitz Aff.; Affidavit of Jack Zaremski, sworn to on November 19, 1991.

words of the Bible tell us of the master-piece of God that is wisdom. In order to bring this attribute of God closer to our understanding, the author of the Book of Proverbs compares divine wisdom to a person who was before all creation and who accompanied God when he created the world.

---

"Were there times in Poland when the sufferings and victimization of Jews were passed over in silence? There were. Were there Poles who paid with their lives for rescuing Jews? There were."

---

God is not only all knowing; he gives sense to each work of creation, knows its development and harmonious place among "things seen and unseen." Thanks to all-embracing wisdom, God put in order the expanse of the waters and gave an outlet to the gushing springs, he formed the rocky mountains, hills and plains, he adorned the sky with clouds and established the foundations of the earth, and all this without effort, with great pleasure as if at play.

In the text of the first reading we feel the great harmony of the work of creation. God loves his work and it is a delight for him, but this joy has its special expression "in the sons of men" (Prv. 8:31). And therefore the appeal to people: "So now, O children, listen to me; instruction and wisdom do not reject!" (Prv. 8:32–33).

The liturgy applies these words about wisdom to the Most Holy Mother. This is entirely understandable, for she, the virgin of Nazareth, accepted Divine Wisdom and expressed this in obedience, in whole-hearted trust in God. For the Divine Wisdom there is joy in such children as Mary and her imitators. For people to partake through obedience in the Divine Wisdom means to enter into the discernment of reality, into harmony between God and creation. It means to possess peace.

## 2. "The Lord Loves the Gates of Zion" (Ps. 87:2)

We may say he loves the gates of Jasna Gora, within which is found present in a painting the mother of the Son of God, given as the "admirable help and defense" (prayer of the day)—the Queen of Poland. We come on the day of Our Lady of Jasna Gora with our troubles. By our obedience to Jesus, we want to gain such wisdom that we may secure peace and prosperity in our country.

That son of St. Francis, Blessed Capuchin Father Honorat, assists us in these petitions. In a time of bondage and far-reaching changes, which found their greatest expression in 1905, he sought to restore the holy day of the mother of God, Our Lady of Czestochowa. This holy day was observed for the first time in 1906, and Father Honorat also organized a national pilgrimage to Jasna Gora in that year. He who was proclaimed blessed last year joins us in beseeching Mary for peace for our country.

The matter of peace takes priority today not only because we are on the eve of a day of great ecumenical prayers for the divine gift of world peace, the 50th anniversary of the outbreak of World War II, but also because of the need to liquidate the effects of the war, which like a thorn in the spirit persist in the postwar generation and injure the sphere of morality.

At stake here is the difficult disengagement of Poles from a reality bristling with mistakes as well as friendly relations with those peoples for whom the traumatic effects of wartime suffering remain. I am thinking here above all of the relations of Poles with Germans and with Jews.

Peace, as the church teaches us, is the gift of God; therefore it should be prayed for and skillfully cultivated. In its social significance, peace is that arrangement among peoples which is founded above all on justice. I want at once to add that it is also to be based on freedom, truth and love. The way to such peace is patient and wise dialogue, which allows us to overcome the obstacles along the path to proper relations among peoples. Let us pause and

consider this problem, limiting ourselves to the religious sphere.

## 3. Dialogue With Germans

The point of departure for successful dialogue is the partners' equal treatment of each other, with mutual respect, even when one is strong and rich, and the other weak and poor. The church in Poland took up such a dialogue when it extended a hand to the German bishops in a gesture of mutual forgiveness on the occasion of the jubilee of the millennium of Polish Christianity. This could come about only on the basis of the Gospel, which allows us to break away from the passionate feelings which animated both nations after the trials of war, and to remember, "Love your enemies as you love yourselves."

That act of 1965, arising from faith and eagerly and kindly accepted by German Christians, soon yielded good fruit not only on the ecclesiastical plane, but also on the social plane. It also established a basis for undertaking conversations and an explanation on an ecclesiastical plane of that which is complicated on a political plane.

Approaching the recollection in prayer of the 50th anniversary of Nazi Germany's attack on Poland, we are aware of the ecclesiastical paths which have evolved that make it possible for both nations to serve peace. The presence among us today of Cardinal Hengsbach, Bishop Homeyer and a group of lay Catholics from Germany, and also our prime minister, Mr. Mazowiecki, is evidence of these paths. Recently Catholics from both nations, almost all lay people, issued a declaration on the anniversary of the outbreak of the war which we received with great appreciation and satisfaction.

"The Carmelite sisters living beside the camp in Auschwitz wanted and want to be a sign of that human solidarity which includes the living and the dead. Do you not see, esteemed Jews, that intervention against them injures the feelings of all Poles and the sovereignty we gained with such difficulty?"

We warmly desire that our relations with our western neighbors become ever fuller and friendlier. We regard the charitable sector with gratitude. There still remains the mutual promotion of the growth of integral respect.

The celebrations of the millennium of Christianity in Russia and the Ukraine have enlightened us about our eastern neighbors and allowed the elimination of prejudices. The path to peace is open. We want to travel it with Christian sensitivity.

## 4. Dialogue With Jews

Life after all does not like schematics and arranges relations between people otherwise than in the categories of friend or foe. With us this refers particularly to the Jewish people, who were never neighbors but housemates, and whose distinct character both enriched and caused difficulties. For many Jews Poland was their fatherland, not only by reason of citizenship, but by reason of authentic love. We read in Pan Tadgusz about Jankiel:

"Speaking, continually he sobbed,
"The good-hearted Jew loved his country like a Pole!"

Besides the Jewish innkeeper who got peasants drunk, besides the Jews who spread communism, there were among the Israelites people who gave Poland both their talents and their lives. We were not indifferent. Thus, the phenomena of anti-Polish sentiment and anti-Semitism could arise.

In order to understand the complexity and pervasiveness of Polish–Jewish problems we ask ourselves: Were there in Poland animosities and quarrels with Jews? There were. Were there Jewish businessmen in Poland who slighted and disdained Poles? There were. During the occupation, were there collaborators among the Jews who were not the equals of the heroic defenders of the ghetto? There were. Were there times in Poland when the sufferings and victimization of Jews were

passed over in silence? There were. Were there Poles who paid with their lives for rescuing Jews? There were. The remembrance of the 50th anniversary of the outbreak of World War II puts us on the same side of the barricade, on the side of extermination and death.

Jews, Gypsies, Poles—these were peoples condemned to death in Nazi strategy, but according to a different plan and on a different scale. For example, Poles were exterminated primarily in the stratum of the intelligentsia. A common destiny joined the persecuted. In the Polish military cemetery at Monte Cassino, in addition to the crosses over the graves of Catholics, there are gravestones with the Star of David—also Polish soldiers. In the mass graves of the Polish officers murdered at Katyn, without a doubt there are also graves of Jews. The brotherhood of common martyrdom and commingled ashes has exceptional eloquence. Antoni Sionimski, a Polish poet who did not hide his origins, brought out the truth about the nameless heroes of Warsaw when he wrote:

"For you my song and my tears,
"Ordinary, plain little people,
"A hundred times and more you fell in battle,
"But who remembers your names?
"Porters, shoemakers, craftsmen,
"Doctors, tailors and servants,
"Wives and sisters, so many months,
"Hidden among ruins down in the cellars,
"Through this folly of blood and glory,
"In agonies, in despair they died,
"For you my tears, hot tears."
(—"Grave of an Unknown Inhabitant of Warsaw")

Many Jews immersed themselves in Polish culture and in Christianity, and the cross which marks their graves did not take away their love for their people.

Therefore, why did the problem of Auschwitz and the convent of the Carmelite sisters arise? Why did it suddenly erupt 40 years after the ovens of the crematoria were extinguished? These questions are very tormenting when we speak of peace, which is to eliminate the effects of war. I would like, in humility and with a desire for conciliation, to touch upon this subject.

The extent of the questions is so great that a dialogue is necessary—a dialogue of systematic explanation of difficult things, which omits nothing. We have our faults regarding the Jews, but today I would like to say: Beloved Jews, do not converse with us from the position of a people raised above all others and do not set conditions that are impossible for us to fulfill.

The Carmelite sisters living beside the camp in Auschwitz wanted and want to be a sign of that human solidarity which includes the living and the dead. Do you not see, esteemed Jews, that intervention against them injures the feelings of all Poles and the sovereignty we gained with such difficulty? Your power is the mass media, which is at your disposal in many countries. Let them not serve to inflame anti-Polish sentiment.

Recently a detachment of seven Jews from New York attacked the convent at Auschwitz. To be sure, because they were restrained, it did not result in the killing of the sisters or the destruction of the convent; but do not call the aggressors heroes. Let us preserve the level of the civilization in which we live. Let us be able to distinguish Oswiecim–Auschwitz, where mostly Poles and other nations perished, from Brzezinka–Birkenau a few kilometers distant, where mostly Jews perished.

Next, let us distinguish the civil plane from the theological plane. Let a new doctrine on the subject of the presence or absence of God in a place of sacrifice be justified and understood by all people who believe in God, and let it not be a political tool in the hands of a group of people, especially non-believers.

May we who venerate Mary of Nazareth and share with you Jews many places revered as holy begin a dialogue in frankness and in truth. If there is no anti-Polish sentiment, there will be no anti-Semitism among us. Our wish for you is that in the holy land of Palestine no one throws stones at you, the sound of gunfire is silenced, no

one perishes from rifle bullets and there is peace-*shalom* there where you are.

5. Toward Peace

Dearest pilgrims!

The Divine Wisdom constantly accompanies the works of God, and the delight of wisdom is "in the sons of men." Today we ask Mary, Seat of Wisdom, to bring the Divine Wisdom closer to us. The words of Vatican Council II resound: "Our age, more than any of the past, needs such wisdom if all that man discovers is to be enobled through human effort" (Pastoral Constitution on the Church in the Modern World, 15).

We are witnessing new and important changes achieved in our country. We must be equal to the great challenges of history and not view in a passive, cynical or hostile way the efforts of people who want to lead Poland on the path to development and good management or on the path to peace.

Therefore, wisdom is needed to see what is possible and what is impossible, to be able to join ranks in order to surmount together a difficult moment, which does not threaten with fists or stamp its feet or stop the turning wheels of our production but encourages the weak.

The concerns of our country—church and people—we place in the hands of Our Lady of Jasna Gora, Queen of Poland. Once more filled with faith and confidence as always, we trust in the Seat of Wisdom, Our Lady of Jasna Gora. Amen.